May it please the court, Tina Schneider for Defendant Cheng Li. Li was convicted of an attempt to acquire the biological toxin ricin for use as a weapon and two related felonies. Ricin is an extremely lethal toxin with no benign purpose. However, Li's conduct did not fit within the biological weapons statute, and the statute itself is unconstitutional. These issues weren't raised below and normally in this situation, the court applies a plain error standard of review. But plain error is intended to ensure that a defendant doesn't try to have it both ways. That is, take one stance at the district court, say, not objecting to instructions, and another at this court, say, complaining about the instructions. But here, there was no strategic advantage to Li by failing to raise these arguments below, and so he should not be subject to the higher standard of review in this court. Even under the plain error standard of review, though, Li should prevail. In Vaughn, the Supreme Court held that in the context of the chemical weapons statute, a defendant who used toxic chemicals to injure a romantic rival did not fall within the statute. That this was not a weapon within the meaning of the statute. Vaughn told us that the statute must be read consistent with principles of federalism, that is, leaving the police power to the states, and with the purpose of the treaty it was implementing, a treaty about warfare and non-of-the-mill crime. Actually, Vaughn suggests that we focus, that the focus was both on the type of chemical and the manner in which it was used. You've just told us that the type of chemical here, ricin, by contrast to the chemicals at issue in Vaughn, has no legitimate use and is deadly. So right away, aren't we in a quite different universe than in Vaughn? No, I would say no. First of all, the chemicals in Vaughn were potentially lethal. There's no question about that. No, but they have legitimate uses. They did have legitimate uses. And that's in sharp contrast to ricin. That's right. But the court said, after discussing the chemicals in Vaughn, the court said, more importantly, it does not fall within the meaning of weapon as it was used in this statute. Now, the biological weapons statute and the chemical weapons statute are so similar that the jurisdictional limits imposed by Vaughn have to apply to the biological weapons statute too. Both were enacted to implement international arms control treaties. Both arose in response to war crimes and active terrorism. And both would intrude on the state police power if construed as broadly as the government maintains. The purpose of the biological weapons convention that underlies this statute was disarmament, was war crimes, was weapons of mass destruction. That was not what was at issue in this case. Let me ask you, I mean, one of the things that influenced Vaughn was that it was a one-time assault, right? Well, actually, it was repeated attempts to assault the rival, the victim. One person, though. One person, right. Now, here, as I understand the record, the defendant put forth that he intended to market, once he developed it and successfully used it in the case at hand, he intended to market ricin as a means of killing some people without leaving it a trace. Why isn't that enough to bring it within the federal sphere? A couple of thoughts, Your Honor. First is that we don't charge and convict people based on their hopes and dreams of whatever they are. Here, it was creating a market for death pills. The second thing, more importantly, is that even if he had somehow developed, you know, pills that he could market to people, that is still just a way to poison individuals. It's not a weapon of mass destruction. When we get back to aspirational crimes, your client is convicted of attempting to possess a biological toxin. One dose. Right. But in soliciting it, he made plain that he did not intend to have this be a one-time purchase. His plan for this toxin was, unlike Vaughn, to market it. Except, Your Honor, even if he, let's say he had developed this, his dream of. So, I mean, is the distinction that if he had solicited 20 ricin tablets instead of one, then it would have fallen within, there wouldn't have been a federalism concern, but there is because he only solicited one to start? No, Your Honor, I don't think that's the case. That's where we draw lines here. Okay. So, if I go out and I say I shoot one person a day for 100 days, I've killed 100 people, I would not be considered having used a weapon of mass destruction even though 100 people died as a result of my actions. When we talk about weapons of mass destruction, which was one of the concerns underlying the treaty and this statute, we're talking about something that is done that injures or kills a lot of people at one time. So, we don't aggregate. Let me use an example that's not far-fetched. A ricin pill was used to kill someone in the United States for political purposes, political retaliation akin to what happened in London. Are you saying that that could not be prohibited by this statute? No, because I am not saying that because... Well, I mean, it doesn't fit your mass destruction requirement. When we're talking about assassination, so the treaty and the statute aimed at terrorism, war crimes, assassination. So, an assassination is different from a murder. You wouldn't say, I assassinated my neighbor. You would say, I killed my neighbor. An assassination means a killing to send a message, to intimidate or coerce a civilian population or make a government respond a certain way. And assassinations are certainly within this, the federal government's purview. Here, there's no indication whatsoever that this was intended to assassinate a prominent person. The government speculates in its brief that it may have been the defendant's father who was the intended victim, but I think that's just mere speculation. But if we take this category of crimes, that is, individual murders by poison out of the hands of the states, which according to the government, that's what has happened here, that's an unconstitutional intrusion on the state police power. But isn't it the fact that soliciting this to be delivered through the mail, didn't that present a risk to the mail handlers, the people at the post office that were going to deal with this, if it had been real? In Boston, one of the two chemicals Bond used was ordered on Amazon and presumably delivered through the mails. And the court did not find that was significant. But that's not, it didn't pose the same risk. I mean, coming into contact with ricin is immediately life-threatening, isn't it? I don't know if, I mean, this ricin, well, it was sham ricin, but it had to have been real ricin, it was encapsulated or at least the one lethal dose was encapsulated. But he wanted it powdered, too. He ordered some extra powder to experiment on small animals. But there is no question ricin is bad stuff. There's no good purpose for it. That's not what I'm here to argue. What I'm here to argue is the term for use as a weapon is a specific, has a specific meaning that doesn't encompass Lee's conduct here. And that's what Bond held, and that's what we're asking this court to hold. Thank you. I know you want to reserve some time. Let's hear from your adversary. Good morning, Your Honors, and may it please the court. My name is Andrew Beatty. I represent the government in this appeal and also represented the government in the trial below. The defendant conceded two points just now in her argument that distinguish this case from Bond. First, that ricin is a deadly poison with no legitimate use. And second, that the defendant planned to create a market to sell death pills on the internet. Both of those points are fatal to Mr. Lee's argument. Attempting to acquire ricin for use in a murder is precisely the sort of conduct that Congress had in mind when it passed Section 175A. Unlike in Bond, this is not a purely local crime that would warrant limiting that statute out of federalism concerns. The three major concerns in Bond were the definition of chemical weapons being improbably broad. That's not the case here. It's a much narrower statute. Biological agents and toxins are defined much more narrowly. They have to be on a schedule, don't they? They have to be specifically identified? And am I right about that? They can be, Your Honor. The regulations do specifically identify ricin as a And Freedy specifically identifies ricin. The annex to the chemical weapons convention, actually, Your Honor, specifically lists ricin. I do not know whether the biological weapon convention also specifically lists ricin. But the definition within the statute requires that these things be poisonous. Poisonous substances are produced by plants or animals. That's already not in the realm of chemical precursors, which the Supreme Court noted could include things like vinegar, common household objects. And here, the particular chemical, particular biological toxin that was used or was attempted to be acquired was ricin. That's, again, much more serious than the chemicals that were used in Bond. Ultimately, those chemicals caused a minor rash on the victim's thumb, were treated with water. Here, ricin is deadly. It's generally undetectable in autopsies. And there's no known antidote. And finally, I think most importantly, the circumstances that Mr. Lee was intending to use the ricin for bring this very far from the facts that Bond was considering. Even the single dose, he was attempting to acquire this for use as a murder weapon. And the facts, even of that single shipment, show that he contemplated future use. The loose ricin that Your Honour mentioned, he said that he was going to experiment on that. That's consistent with all of his discussions of attempting to find a perfect death pill that he could make money selling on the dark web. May I ask you, can one acquire ricin if one has an appropriate licence? Yes, Your Honour. There's a pretty substantial regulatory regime, federal regulatory regime. The Department of Health and Human Services can allow people to acquire ricin for biomedical research, for example. We go into some of... But otherwise it's illegal to possess it? That's correct, under this statute. Under this statute? Yes, this statute criminalizes possession or acquisition of ricin. Are we dealing with something that can be analogized to Controlled Substances Act, then? Absolutely, Your Honour. In our section discussing the constitutionality of this statute under the Commerce Clause, the regulatory regime here is very similar to the regulatory regime about controlled substances that the Supreme Court discussed in Gonzales v. Raich. Is that a distinction from Bond where the substances there were not federally... ...were not federally controlled. That's correct. Those were chemicals that were not... I think... I don't know whether each of those were illegal to possess, but they were much more common household chemicals, at least some of them that were used. I'm happy to discuss the other bases for the constitutionality of the statute if the Court has any questions on that point. Otherwise, I'm happy to rest on my submission. Thank you. Thank you, Your Honour. Thank you. A few points. In Bond, the chemicals were not... One of the chemicals was not available to the general public. The defendant in Bond stole that from her employer. It was an arsenic-based chemical. Secondly, the definition of biological weapon is actually much broader than the definition of chemical weapon. Not narrower, as the government would have you believe. In both statutes, the substances regulated are those that can cause death or harm to humans or animals. But the biological weapon statute goes further and says it also includes substances harmful to plants, substances that can cause deterioration of food, water, material of any kind, and substances that are harmful to the environment. So it's way broader than the chemical weapon statute. In fact... ..if I were mad at my neighbour, I had ill intent, and I sent my dog over to pee on my neighbour's lawn, that would be deployment of a biological weapon if you were to accept the government's argument, because it's the toxic material of an animal that can cause harm to plants. On your federalism argument, though, once the substance is federally controlled, so that it is illegal to possess it... Mm-hm. ..except in conformity with federal law, why isn't the use of the weapon, intending to use it to kill someone, then permissibly a matter for federal law? Because the government... ..by saying that it's... ..covers this situation... ..it enlarges the statute beyond what the treaty, that it was implementing, concerned, and what the federal government can do. So, for example... ..if you interpret this... I'm not following that. If you... You know, again, it's my controlled substance analogy, and I'm trying to figure out why that wouldn't be an appropriate one. Because this statute says, for use as a weapon. It doesn't say, you can't have ricin, or you can't have these biological agents. It says, you can have them for use as a weapon. I don't know how that helps you. I would think it would be even more appropriate. They control the substance. You can't possess it without a licence. And if you use it... And the reason they control it is because it's deadly. And if you use it to try to kill somebody, then, yes, the federal law will come down on you. Why is that not permissible? Why does that offend federalism? I would understand the argument if you were taking the view that they can't control it at all. They can't control its possession. But once you agree that the federal government can control its possession, I would think they could penalise uses of it that cause actual harm. What am I missing in your argument? Well, for one thing, this statute covers almost every substance on earth. It covers any microorganism, fungus, toxic material generated by humans or animals. You know, where they've got licence specifically identified on the schedule, do we have to go further than that and approve all possible uses of the statute? We only have to decide your clients, the application of the statute to your client. Isn't that right? Well, but my client didn't use this as a weapon under the statute. The statute has to be interpreted consistent with Bond. And Bond said, no, this is not what's meant for use as a weapon. Peaceful purposes does not mean anything aggressive towards others. It means non-warlike activity. And my client was not engaging in warlike activity. Thank you.